# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

Katherine Ann Baron

    v.

Nancy A. Berryhill, Acting
Commissioner, Social
Security Administration

Case No. 16-cv-308-JL
Opinion No. 2017 DNH 156


## O R D E R

Pursuant to 42 U.S.C. § 405(g), Katherine Baron moves to reverse the Acting Commissioner's decision to deny her applications for Social Security disability insurance benefits, or DIB, under Title II of the Social Security Act, 42 U.S.C. § 423, and for supplemental security income, or SSI, under Title XVI, 42 U.S.C. § 1382. The Acting Commissioner, in turn, moves for an order affirming her decision. For the reasons that follow, the decision of the Acting Commissioner, as announced by the Administrative Law Judge ("ALJ") is affirmed.

### I. Standard of Review

The applicable standard of review in this case provides, in pertinent part:

> The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if

supported by substantial evidence, shall be conclusive
. . . .

42 U.S.C. § 405(g) (setting out the standard of review for DIB
decisions); see also 42 U.S.C. § 1383(c)(3) (establishing §
405(g) as the standard of review for SSI decisions). However,
the court "must uphold a denial of social security . . .
benefits unless 'the [Acting Commissioner] has committed a legal
or factual error in evaluating a particular claim.'" Manso-
Pizarro v. Sec'y of HHS, 76 F.3d 15, 16 (1st Cir. 1996) (per
curiam) (quoting Sullivan v. Hudson, 490 U.S. 877, 885 (1989)).

As for the statutory requirement that the Acting
Commissioner's findings of fact be supported by substantial
evidence, "[t]he substantial evidence test applies not only to
findings of basic evidentiary facts, but also to inferences and
conclusions drawn from such facts." Alexandrou v. Sullivan, 764
F. Supp. 916, 917-18 (S.D.N.Y. 1991) (citing Levine v. Gardner,
360 F.2d 727, 730 (2d Cir. 1966)). In turn, "[s]ubstantial
evidence is 'more than [a] mere scintilla. It means such
relevant evidence as a reasonable mind might accept as adequate
to support a conclusion.'" Currier v. Sec'y of HEW, 612 F.2d
594, 597 (1st Cir. 1980) (quoting Richardson v. Perales, 402
U.S. 389, 401 (1971)). But, "[i]t is the responsibility of the
[Acting Commissioner] to determine issues of credibility and to

2

draw inferences from the record evidence.  Indeed, the resolution of conflicts in the evidence is for the [Acting Commissioner], not the courts." Irlanda Ortiz v. Sec'y of HHS, 955 F.2d 765, 769 (1st Cir. 1991) (per curiam) (citations omitted).  Moreover, the court "must uphold the [Acting Commissioner's] conclusion, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." Tsarelka v. Sec'y of HHS, 842 F.2d 529, 535 (1st Cir. 1988) (per curiam).  Finally, when determining whether a decision of the Acting Commissioner is supported by substantial evidence, the court must "review[] the evidence in the record as a whole." Irlanda Ortiz, 955 F.2d at 769 (quoting Rodriguez v. Sec'y of HHS, 647 F.2d 218, 222 (1st Cir. 1981)).

## II. Background

The parties have submitted a Joint Statement of Material Facts.  That statement, document no. 12, is part of the court's record and will be summarized here, rather than repeated in full.

Baron applied for DIB in January of 2013, and applied for SSI in June of that year.  In both applications, she claimed to have been disabled since January 6, 2012, as a result of chronic back pain, anxiety, depression, bipolar disorder, and

alcoholism.  The court begins by focusing on Baron's physical

impairments and then turns to her mental impairments.

A. Physical Impairment

On January 10, 2013, Baron began treating with Dr. Robert

Niegisch.  Before that, she had been prescribed Percocet for

back pain, through the NeuroSpine Institute.[1]

On January 25, 2013, Baron saw Dr. Niegisch with a chief

complaint of low back pain.  In his chart document, under the

heading "Assessment," Dr. Niegisch wrote:

> Chronic low back pain.  . . .  In the interim for the
> short term, given what appears to be a musculoskeletal
> issue very likely related to a congenital issue, but
> without to my knowledge any known significant spinal
> pathology, we will give her some narcotics to help her
> sleep at night.  . . .  We will try to get copies of
> her lumbar MRI in preparation for [an] appointment
> [scheduled for five days later].

Administrative Transcript (hereinafter "Tr.") 297-98.  After

Baron's follow-up appointment, Dr. Niegisch observed that she

had "horrible posture . . . lean[ing] forward and to the side."

Tr. 293.  He assessed her as having "[c]hronic low back pain,

underlying scoliosis and fusion of L4-L5 per abdominal x-ray

---

[1] Percocet is a "trademark for a combination preparation of
oxycodone hydrochloride and acetaminophen."  Dorland's
Illustrated Medical Dictionary 1409 (32rd ed. 2012).  Oxycodone
is "an opioid agonist analgesic derived from morphine."  Id. at
1356.

radiology studies." Id.  Dr. Niegisch also stated: "We need an

MRI of her back."  Id.

In a February 7, 2013, chart document that Dr. Niegisch

wrote after he obtained an MRI of Baron's back, he reported:

> She continues to be most comfortable leaning forward
> in kind of a hunched forward posturing position.  This
> is just so very interesting relative to her MRI
> findings, which were fairly stable between '06 and
> '09, with the interesting finding of her foraminal
> cyst not likely representing apparently a source of
> pain.  She does have congenital, at least partial,
> effusion of L4-5 and scoliosis which likely sets her
> up for trouble, but she interestingly has, on most
> recent study, fairly open foraminal exits and as such
> I would think the rehabilitation potential for her
> and/or the amenability to successful injection therapy
> might be quite high.[2]

Tr. 288.  After making that report, Dr. Niegisch gave the

following assessment: "Pain management for chronic congenital

back discomfort with scoliosis L4-5 fusion and a foraminal

cyst."  Id.

Dr. Niegisch saw Baron approximately 20 more times, at

irregular intervals, between February of 2013 and September of

2014.  About seven of Baron's subsequent visits to Dr. Niegisch

involved complaints about or treatment for her back pain.  In

---

[2] Effusion is "[t]he escape of fluid from the blood vessels
or lymphatics into the tissues or a cavity."  Stedman's Medical
Dictionary 616 (28th ed. 2006).  Scoliosis is an "[a]bnormal
lateral and rotational curvature of the vertebral column."  Id.
at 1734.  A foramen is "[a]n aperture or perforation through a
bone or a membranous structure."  Id. at 756.

July of 2013, Dr. Niegisch noted that Baron's "last MRI a number of years ago revealed some semblance of L4-L5, L5-S1 left-sided nerve root irritation perhaps from a ganglion,"[3] Tr. 247, and reported the following objective findings:

> [S]he had some pain in the low back in the paraspinous muscles and centrally and about the low lumbar spine level. She flexed and twisted fairly well. Straight leg raising to 45 degree[s] right, only 20 degrees left. I could get her to 45 degrees before pain ensued in her low back. . . . I examined her hip and there was no difficulty with internal or external rotation, flexion or extension. Reflexes certainly depressed at both knees, a little bit more depressed on the left ankle than the right. Babinski toes withdrawal. Light touch is intact distally.[4]

Id. Based upon his examination, Dr. Niegisch assessed Baron with "[u]nusual left leg symptoms with radicular issues of sciatica and low back discomfort, a little outside the usual and customary." Id. In an October 15, 2013, chart document that resulted from an office visit to "follow up on anxiety, depression, recent medication overdose, seizure,

---

[3] A ganglion is "an aggregation of nerve cell bodies located in the peripheral nervous system." Stedman's, supra note 2, at 785.

[4] Babinski's sign is the "extension of the great toe and abduction of the other toes instead of normal flexion reflex to plantar stimulation, considered indication of corticospinal tract involvement." Stedman's, supra note 2, at 1766.

hospitalization, [and] underlying macrocytosis,"[5] Tr. 359, Dr.

Niegisch wrote: "We are going to set her up for an MRI of her

low back, with a followup consultation up at Dartmouth," id.

The record includes no evidence that either the MRI or the

followup consultation ever took place.

For Baron's back pain, Dr. Niegisch prescribed medication

and recommended formal pain management.  Baron does not appear

to have followed the pain-management recommendation with any

consistency, nor is there any record of her engaging in physical

therapy, as was once recommended, see Tr. 247.

On December 24, 2013, Baron was given a consultative

orthopedic examination by Dr. Peter Loeser.[6]  He diagnosed her

with "[l]ow back pain of uncertain etiology."  Tr. 383.  With

respect to Baron's cervical spine and her thoracic spine, Dr.

Loeser noted multiple negative findings and a single positive

finding: "Mild scattered tenderness on palpation of the spinous

---

[5] Macrocytosis is "[t]he occurrence of unusually large
numbers of macrocytes in the circulating blood."  Stedman's,
supra note 2, at 1140.

[6] "A consultative examination is a physical or mental
examination or test purchased for [a claimant] at [the Social
Security Administration's] request."  20 C.F.R. §§
404.1545(a)(1) & 416.945(a)(1).  The record also includes a
report of a June 2012 consultative examination by Dr. Loeser
that, presumably, was requested in the context of an earlier
unsuccessful application for Social Security benefits.

7

processes at all levels." Tr. 382. With respect to her lumbar

spine, he noted several negative findings plus these positive

findings:

> Mild scattered tenderness on palpation of the spinous
> processes at all levels with moderate tenderness to
> palpation over the left [sacroiliac] joint. Supine
> straight leg raise limited about 50 degrees on right
> and about 50 degrees on left due to pain in lower
> back.

Id. As for Baron's gait and station, Dr. Loeser noted several

negative findings, along with a single positive finding: "Gait

remarkable for a mild left leg antalgic limp due to pain." Tr.

383. Dr. Loeser then gave the following assessment of Baron's

low back pain:

> There are subjective findings on physical examination,
> and limited available documentation to support . . .
> these symptoms, without a defined underlying etiology
> for these symptoms. There are no available imaging
> studies. The patient notes a history of having had a
> breast enlargement in 2006 at or around the onset of
> these symptoms, and it should be noted that the
> patient's breast[s] are remarkably large for her
> rather small frame and could be directly related to
> these symptoms. Though the patient states these
> symptoms are having a significant impact on overall
> function, there is insufficient evidence to support
> this conclusion.

Id.

On December 30, 2013, a non-examining state-agency medical

consultant, Dr. Donald Trumbull, reviewed Baron's medical

records. He determined that those records did not establish any

medically determinable physical impairment.  Necessarily, he

offered no assessment of the severity of Baron's back condition,

and did not assess her physical residual functional capacity

("RFC").[7]

On September 18, 2014, approximately 15 months after he had

last addressed complaints from Baron relating to her back

condition, Dr. Niegisch completed a "Physical Residual

Functional Capacity Questionnaire" on Baron.  In it, he

indicated a diagnosis of low back pain that, in his opinion had

lasted, or could be expected to last, for at least 12 months.

When asked to "[i]dentify . . . clinical findings and objective

signs," Tr. 385, Dr. Niegisch wrote: "Tender [left] paraspinous

muscles [and] scoliosis.  See enclosed MRI."  Id.  Dr.

Niegisch's reference to tender paraspinous muscles appears to be

based upon an examination he had administered about 15 months

earlier, in July of 2013.  See Tr. 247.  With regard to Baron's

functional capacity, Dr. Niegisch opined that she could: (1) sit

for one hour at a time before needing to get up; (2) stand for

one hour at a time before needing to sit down or walk around;

(3) sit for less than two hours in an eight-hour work day (with

---

[7] "Residual functional capacity" is a term of art that means
"the most [a claimant] can still do despite [her] limitations."
20 C.F.R. §§ 404.1519 & 416.919.

9

normal breaks); (4) stand/walk for less than two hours in an eight-hour work day (with normal breaks). He also opined that Baron needed to: (1) change position every 60 minutes; (2) have a job that allows her to shift positions at will; and (3) take hourly unscheduled breaks during an eight-hour work day. The questionnaire also included questions about Baron's capacity for lifting, and about postural and manipulative limitations, but Dr. Niegisch did not answer them. Rather, he stated that those abilities "would have to be tested formally." Tr. 387.

On November 4, 2014, Baron saw Dr. Niegisch for a six-week follow up for depression, anxiety, and chronic low back pain. In his note on Baron's visit, Dr. Niegisch gave the following assessment: "Anxiety, depression, chronic low back discomfort not really at issue here. This is more social in origin." Tr. 407.

B. Mental Impairments

On October 8, 2013, Baron saw Dr. Niegisch, complaining of "an exacerbation of depression." Tr. 363. Dr. Niegisch gave the following assessment: "Fairly significant depression. Opiate dependence. Noncompliance with narcotics contracts. Ongoing issues with alcohol abuse. Adjustment disorder with depressed mood." Id. Dr. Niegisch sent Baron to the emergency room at Concord Hospital, believing "that she [was] a candidate

10

for acute psychiatric intervention, if not admission to the hospital." Id. At the ER, she received a mental health evaluation from physician's assistant Ann Kearns. PA Kearns diagnosed Baron with suicidal ideation, escalating depression and anxiety, and substance abuse. After completing the evaluation, PA Kearns referred Baron to Riverbend Community Mental Health ("Riverbend"), where she was seen by Roy Dewinkeleer, a social worker. He diagnosed Baron with depressive disorder, not otherwise specified, and polysubstance dependence. After determining that Baron posed a low risk for suicide, Dewinkeleer noted that she did "not wish to be hospitalized, and [did] not meet the standards of an [involuntary emergency admission] at [that] time." Tr. 318. Dewinkeleer gave Baron contact information, and a follow-up appointment was made for her, but there is no evidence in the record that she kept that appointment or had any other contact with Riverbend until December of 2014, more than a year later. As best the court can tell from the record, Baron's mental-health treatment has been limited to medication prescribed by Dr. Niegisch.

On July 6, 2012, Baron was given a consultative psychological examination by Dr. Juliana Read.[8] Dr. Read diagnosed Baron with: "Panic Disorder With Agoraphobia; Major Depressive Disorder, Moderate, First Episode; Opiate Abuse/Dependence – In Remission." Tr. 235. In the Mental Health Evaluation Report she completed after examining Baron, Dr. Read gave the following opinions on Baron's then-current level of functioning:

> **Activities of Daily Living**: . . . Kathie is capable of attending to her activities of daily living, outside of interference associated with her physical pain. She is able to attend to hygiene, care for the home and personal property, drive and handle finances.

> **Social Functioning**: . . . Kathie, despite impairments, is capable of interacting appropriately and communicating effectively with others.

> **Understanding and Remembering Instructions**: . . . Kathie is capable of understanding and remembering both simple and complex instructions and detailed procedures, despite her impairments.

> **Concentration and Task Completion**: . . . [T]hough Kathie is able to maintain attention, she is not consistently capable of holding her concentration, due to high anxiety and depressed mood.

> **Reaction to Stress, Adaptation to Work or Work-like Situations**: . . . Kathie is capable of making simple decisions, interacting appropriately with supervisors

---

[8] As with Dr. Loeser's first consultative physical examination, Dr. Read's examination appears to have been requested in the context of a previous unsuccessful application for Social Security benefits.

and maintaining a schedule, against aside from
impairment associated with her physical pain.

Tr. 234-35.

On November 19, 2013, Baron was given a consultative
psychological examination by Dr. William Dinan.  Dr. Dinan
provided a diagnosis of anxiety disorder, not otherwise
specified.  In the Mental Health Evaluation Form he completed
after examining Baron, Dr. Dinan gave the following opinions on
Baron's then-current level of functioning:

> **Activities of Daily Living**: . . .  Claimant is able to
> provide independent personal care and hygiene, shop,
> cook, drive, and manage personal finances
> independently.
>
> **Social Functioning**: . . .  Widowed ('81-'84); Divorced
> ('94-'05); Married ('06-P); no children; no social
> contact with family or friends, one neighbor; at work
> in '11 - good relationships with coworkers,
> supervisors, and customers.
>
> **Concentration, persistence or pace**: . . .  At home –
> independent; task initiation erratic, persistence
> poor, pace slow, able to adjust to unexpected changes
> in schedule; at work – 2 yrs.  Screen printing until
> business closed in '11.
>
> **Episodes of decompensation**: . . .  Hospitalized 1x in
> '12, 2 days, suicidal.

Tr. 374-75.  With regard to Baron's ability to react to stress
and her ability to adapt to work or work-like situations, Dr.
Dinan stated:

> Anxious when overstressed; cigarettes – 1/2 pk./day;
> alcohol – none for 2 mo., past problems for prior 5

yrs.; illegal drugs – none, past problems with crack
during 2nd marriage ('94-'05); Rx- past problems with
pain medication ('09-'12); arrested 1x ('13) MVA;
never in jail, prison, or military.

Tr. 375.

On December 10, 2013, a non-examining state-agency

psychological consultant, Dr. Edward Martin, reviewed Baron's

records and conducted a psychiatric review technique ("PRT")

assessment based on those records.[9] Dr. Martin determined that

as a result of her anxiety disorder, Baron had: mild

restrictions on her activities of daily living; mild

difficulties in maintaining social functioning; mild

difficulties in maintaining concentration, persistence or pace;

and had no repeated episodes of decompensation, each of extended

duration. Dr. Martin offered the following additional

explanation of his PRT assessment:

> Sources: W. Dinan, Ph.D. (Consultative Examiner) and
> R. Dewinkeleer, MSW (treating) whose opinions are
> given weight with exceptions: Dr. Dinan opines erratic
> task initiation and poor persistence, yet there is no
> objective evidence put forth in support of such
> assertions which are therefore given less weight.
>
> The available evidence supports conclusions that Ms.
> Baron, despite impairments, is able to adequately care
> for herself independently if required to do so, to
> interact effectively with others, to maintain
> concentration/persistence/pace, and to otherwise

---

[9] The Social Security Administration uses the PRT to
evaluate the severity of mental impairments. See 20 C.F.R. §§
404.1520a & 416.920a (describing the PRT).

tolerate the stresses common to work or work-like
situations.  Thus, Impairments Not Severe is a[n]
appropriate conclusion.

Tr. 56, 66.

C. The ALJ's Decision

After Baron's claim was denied at the initial level, she

received a hearing before an ALJ.  Subsequently, the ALJ issued

a decision that includes the following relevant findings of fact

and conclusions of law:

3.  The claimant has the following medically
determinable impairments: scoliosis and esophageal
reflux; mood disorder; anxiety disorder; and substance
abuse disorders (opiate abuse and alcohol abuse) (20
CFR 404.1521 et seq. and 416.921 et seq.).

. . . .

4.  The claimant does not have an impairment or
combination of impairments that has significantly
limited (or is expected to significantly limit) the
ability to perform basic work-related activities for
12 consecutive months; therefore, the claimant does
not have a severe impairment or combination of
impairments (20 CFR 404.1521 et seq. and 416.921 et
seq.).

Tr. 12, 14.

**III. Discussion**

A. The Legal Framework

To be eligible for disability insurance benefits, a person

must: (1) be insured for such benefits; (2) not have reached

retirement age; (3) have filed an application; and (4) be under

15

a disability.  See 42 U.S.C. §§ 423(a)(1)(A)-(D).  To be

eligible for supplemental security income, a person must be

aged, blind, or disabled, and must meet certain requirements

pertaining to income and assets.  See 42 U.S.C. § 1382(a).  The

question in this case is whether the ALJ correctly determined

that Baron was not under a disability from January 6, 2012,

through April 21, 2015.

To decide whether a claimant is disabled for the purpose of

determining eligibility for either DIB or SSI benefits, an ALJ

is required to employ a five-step process.  See 20 C.F.R. §§

404.1520 (DIB) & 416.920 (SSI).

> The steps are: 1) if the [claimant] is engaged in
> substantial gainful work activity, the application is
> denied; 2) if the [claimant] does not have, or has not
> had within the relevant time period, a severe
> impairment or combination of impairments, the
> application is denied; 3) if the impairment meets the
> conditions for one of the "listed" impairments in the
> Social Security regulations, then the application is
> granted; 4) if the [claimant's] "residual functional
> capacity" is such that he or she can still perform
> past relevant work, then the application is denied;
> 5) if the [claimant], given his or her residual
> functional capacity, education, work experience, and
> age, is unable to do any other work, the application
> is granted.

Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001) (citing 20

C.F.R. § 416.920).

The claimant bears the burden of proving that she is

disabled.  See Bowen v. Yuckert, 482 U.S. 137, 146 (1987).  She

must do so by a preponderance of the evidence.  See Mandziej v.

Chater, 944 F. Supp. 121, 129 (D.N.H. 1996) (citing Paone v.

Schweiker, 530 F. Supp. 808, 810-11 (D. Mass. 1982)).  Finally,

> [i]n assessing a disability claim, the [Commissioner]
> considers objective and subjective factors, including:
> (1) objective medical facts; (2) [claimant]'s
> subjective claims of pain and disability as supported
> by the testimony of the [claimant] or other witness;
> and (3) the [claimant]'s educational background, age,
> and work experience.

Mandziej, 944 F. Supp. at 129 (citing Avery v. Sec'y of HHS, 797

F.2d 19, 23 (1st Cir. 1986); Goodermote v. Sec'y of HHS, 690

F.2d 5, 6 (1st Cir. 1982)).

### B. Baron's Claims

Baron claims that the ALJ erred by determining that neither

her scoliosis nor her mental impairments qualified as severe, as

that term is used at step 2 of the sequential evaluation

process.  The court begins by describing the step 2 severity

requirement and then discusses the ALJ's application of that

standard to claimant's physical and mental impairments.

### 1. The Step 2 Standard

In its most recent consideration of step 2, the court of

appeals for this circuit explained:

> An impairment is "severe" when it "significantly
> limits [the claimant's] physical or mental ability to
> do basic work activities."  20 C.F.R. § 404.1520(c).
> "Under Social Security Ruling 85-28, a claim may be
> denied at step 2 for lack of a severe impairment only

17

> where medical evidence establishes only a slight
> abnormality . . . which would have no more than a
> minimal effect on an individual's ability to work even
> if the individual's age, education, or work experience
> were specifically considered . . . ." <u>Barrientos v.
> Secretary of Health and Human Services</u>, 820 F.2d 1, 2
> (1st Cir. 1987) (per curiam) (internal quotation marks
> and citation omitted).  Social Security Ruling 85-28
> (Medical Impairments that Are Not Severe) clarifies
> that the step two severity requirement is intended "to
> do no more than screen out groundless claims."
> <u>McDonald v. Secretary of Health and Human Services</u>,
> 795 F.2d 1118, 1124 (1st Cir. 1986).

<u>Ramos v. Barnhart</u>, 60 F. App'x 334, 335 (1st Cir. 2003) (per curiam).  In other words, "the Step 2 severity requirement is . . . a <u>de minimis</u> policy."  <u>McDonald</u>, 795 F.2d at 1124.

### 2. Scoliosis

Baron claims that the ALJ made two interrelated errors in determining that her scoliosis was not a severe impairment.  She begins by arguing that the ALJ erred by basing his step 2 determination on his own interpretation of raw medical evidence.  Her argument is that the ALJ's step 2 determination was necessarily based upon his interpretation of raw medical evidence because he: (1) rejected the opinion of the state-agency consultant, Dr. Trumbull; (2) gave little or no weight to the opinion of her treating physician, Dr. Niegisch; and (3) gave great weight to the opinion of the consultative examiner, Dr. Loeser, which was of limited probative value because Dr. Loeser rendered his opinion without seeing the results of any

imaging studies.[10]  According to Baron, the ALJ's rejection of

two medical opinions and the inherent unreliability of Dr.

Loeser's opinion left him with nothing but his own

interpretation of raw medical data on which to base his step 2

determination.

The problem with that argument is that the legal authority

on which Baron bases it is inapposite.  The cases he cites all

stand for the proposition that when assessing a claimant's RFC,

"an ALJ, as a lay person, is not qualified to interpret raw data

in a medical record."  Manso-Pizarro, 76 F.3d at 17 (citing

Perez v. Sec'y of HHS, 958 F.2d 445, 446 (1st Cir. 1991);

Gordils v. Sec'y of HHS, 921 F.2d 327, 329 (1st Cir. 1990)); see

also Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) ("The ALJ

was not at liberty to . . . substitute his own views for

uncontroverted medical opinion.") (citations omitted).

The decision from this district on which Baron relies is to

similar effect.  In McLaughlin v. Colvin, the ALJ rejected a

physician's opinion that the claimant was unable to do more than

---

[10] Dr. Loeser acknowledged that there were no imaging
studies available to him.  See Tr. 383.  But Dr. Niegisch
indicated that while Baron's MRIs revealed a foraminal cyst, see
Tr. 288, he also stated that the cyst was probably not a source
of pain, see id.  That tends to undercut any argument that Dr.
Loeser would have reached a different conclusion if he had been
able to see imaging studies.

sedentary work because that opinion was "contrary to treatment records that indicate improvement after shoulder surgery, mild disc desiccation and no nerve impingement, normal gait and station, and normal neurological exams," No. 14-cv-154-LM, 2015 WL 3549063, at *5 (D.N.H. June 8, 2015) (quoting the ALJ's decision). Judge McCafferty explained the ALJ's error this way:

> "[t]he court of appeals for this circuit has repeatedly held 'that since bare medical findings are unintelligible to a lay person in terms of residual functional capacity, the ALJ is not qualified to assess residual functional capacity based on a bare medical record.'" Jabre [v. Astrue, No. 11-cv-332-JL], 2012 WL 1216260, at *8 (quoting Gordils v. Sec'y of HHS, 921 F.2d 327, 329 (1st Cir. 1990)). That is why, "when assessing a claimant's RFC, '[t]he general rule is that an expert is needed to assess the extent of functional loss." Jabre, 2012 WL 1216260, at *8 (quoting Roberts v. Barnhart, 67 F. App'x 621, 622–23 (1st Cir. 2003); citing Manso-Pizarro, 76 F.3d at 17).

Id.

Baron's reliance on Nguyen, Manso-Pizarro, Gordils, and McLaughlin is misplaced because the situation they address – an ALJ making an RFC assessment without the benefit of a medical opinion – is not present here; the ALJ in this case never assessed Baron's physical or mental RFC. Thus, the part of claimant's argument that is based on Nguyen, Manso-Pizarro, Gordils, and McLaughlin fails.

Baron also makes a second, more circumscribed argument that the ALJ erred by giving more weight to the opinions of Dr. Loeser than to those of Dr. Niegisch.  That argument also fails.

The Social Security regulations governing the evaluation of opinion evidence provide that

> [g]enerally, [an ALJ should] give more weight to opinions from [a claimant's] treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations . . .

20 C.F.R. §§ 404.1527(c)(2) & 416.927(c)(2).  Where, as here, an ALJ does not give controlling weight to a treating source's opinion, see id., he must determine how much weight to give that opinion by considering a variety of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, the medical specialization of the treating source, and any other relevant factors, see 20 C.F.R. §§ 404.1527(c)(2)-(6) & 416.927(c)(2)-(6).  Moreover, an "ALJ may give little weight to a treating source's opinion if that opinion 'is inconsistent with other

substantial evidence in the record, including treatment notes and evaluations by examining and non-examining physicians.'" Therrien v. Berryhill, No. 16-cv-185-LM, 2017 WL 1423181, at *5 (D.N.H. Apr. 21, 2017) (quoting Glynn v. Colvin, No. 16-CV-10145-LTS, 2017 WL 489680, at *2 (D. Mass. Feb. 6, 2017)).

Finally, after weighing a treating source's opinion, the ALJ must give good reasons for the amount of weight he affords it.

> To meet the "good reasons" requirement, the ALJ's reasons must be both specific, see Kenerson v. Astrue, No. 10-cv-161-SM, 2011 WL 1981609, at *4 (D.N.H. May 20, 2011) (citation omitted), and supportable, see Soto-Cedeño v. Astrue, 380 Fed. Appx. 1, 4 (1st Cir. 2010). In sum, the ALJ's reasons must "offer a rationale that could be accepted by a reasonable mind." Widlund v. Astrue, No. 11-cv-371-JL, 2012 WL 1676990, at *9 (D.N.H. Apr. 16, 2012) (citing Lema v. Astrue, C.A. No. 09-11858, 2011 WL 1155195, at *4 (D. Mass. Mar. 21, 2011)), report and recommendation adopted by 2012 WL 1676984 (D.N.H. May 14, 2012).

Martinage v. Berryhill, No. 16-cv-245-PB, 2017 WL 1968291, at *8 (D.N.H. Apr. 20, 2017) (quoting Jenness v. Colvin, No. 150cv-005-LM, 2015 WL 9688392, at *6 (D.N.H. Aug. 27, 2015)), R. & R. adopted by 2017 WL 1968273 (May 11, 2017). However, "there is no requirement that the ALJ explicitly examine each listed factor in the decision." Therrien, 2017 WL 1423181, at *5 (citing McNelley v. Colvin, No. 15-1871, 2016 WL 2941714, at *2

(1st Cir. Apr. 28, 2016); <u>Genereux v. Berryhill</u>, No. 15-13227-GAO, 2017 WL 1202645, at *2 (D. Mass. Mar. 31, 2017)).

In his opinion, the ALJ gave "substantial weight to the opinion evidence offered by the examining medical consultant, Peter Loeser, M.D. with regard to the nature and severity of the claimant's physical impairments," Tr. 20, and "limited weight to [the] opinion evidence offered by Robert Niegisch, M.D.," <u>id.</u> The evidence the ALJ discounted is Dr. Niegisch's opinion that Baron had "an assessed ability to sit as well as to stand/walk for a total of less [than] 2 hours each in an 8-hour workday along with an assessed need to be able to shift positions at will and to take frequent, unscheduled breaks on an hourly basis," <u>id.</u>, a set of limitations that plainly crosses the step 2 severity threshold. Baron argues that the reasons the ALJ gave for discounting Dr. Niegisch's opinion do not qualify as good reasons.

The ALJ discounted Dr. Niegisch's opinion because of the limited scope of his treatment of Baron, the lack of support for his opinion in his treatment records, and the inconsistency between his opinion and other evidence in the record. In so doing, he "offer[ed] a rationale that could be accepted by a reasonable mind." <u>Martinage</u>, 2017 WL 1968291, at *8 (quoting <u>Widlund</u>, 2012 WL 1676990, at *9).

First, the ALJ noted the lack of evidence of "any significant treatment undertaken to address the claimant's [back] pain." Tr. 20. Indeed, Dr. Niegisch's treatment notes document little if any treatment other than pain medication, and also document Dr. Niegisch's concerns – backed up by both test results and statements from Baron herself – that she was not even taking all of her prescribed pain medication.[11] Dr. Niegisch also reported Baron's resistance to engaging in formal pain management treatment. And, as noted above, when Dr. Niegisch opined that Baron was suffering from low back pain that had lasted or could be expected to last at least twelve months, it had been 15 months since Baron had last complained about, or he had provided treatment for, Baron's back condition. In short, substantial evidence supports the ALJ's conclusion that

---

[11] With regard to why Baron was not taking all of her medication, Dr. Niegisch had this to say when discussing Baron's recent hospitalization in a March 29, 2013, chart document:

> She apparently, interestingly, had a negative tox screen for her oxycodone, which is a little disconcerting. She said she stopped it because it was not helping yet. She still went to the emergency room for pain, which is again somewhat inconsistent. The question here [is] diversion, and [we] will have to monitor for that going forward.

Tr. 278.

Dr. Niegisch provided relatively limited treatment for Baron's
back impairment.

Similarly, the ALJ stated that Dr. Niegisch's RFC
questionnaire "fail[ed] to note any specific medically
documented objective findings to support the limitations
assessed, while a review of his treatment records also fails to
reveal evidence of any significant objective findings related to
the claimant's back impairment."  Tr. 20.  To be fair, the ALJ
did note, under the heading "clinical findings and objective
signs," that Baron had "tender [left] paraspinous muscles," Tr.
385, but that notation was based upon a physical examination
that had been conducted approximately 15 months earlier, and
that had been followed by no further complaints about or
treatment for Baron's back condition.  To be sure, there are
some objective findings scattered through Dr. Niegisch's
treatment notes, such as one straight-leg raising test and
comments on Baron's posture, but whether those findings qualify
as "significant" is a judgment call that falls squarely within
the purview of the ALJ.  See Irlanda-Ortiz, 955 F.2d at 769.  In
short, the ALJ's second reason for discounting Dr. Niegisch's
opinion is supported by substantial evidence.

Finally, there is also substantial evidence for the ALJ's
conclusion that Dr. Niegisch's opinion was generally

inconsistent with the weight of the other evidence in the record.  Plainly, Dr. Niegisch's opinion is inconsistent with those provided by Drs. Loeser and Trumbull.  Moreover, his opinion is inconsistent with his own note from an office visit in June of 2014, which reports:

> Here to reestablish [care] after a prolonged hiatus
> now of probably half a year.  . . .  She has purchased
> a trailer with her husband.  Things are going fairly
> well there.  She is walking daily.  She is fishing.
> She is working on her home.  . . .  She really has not
> taken any medicines since November.

Tr. 421.  Moreover, that office note includes neither objective findings nor any diagnosis related to claimant's purportedly disabling back condition.  And, in November of 2014, shortly after he rendered his opinion, Dr. Niegisch noted Baron's chronic low back discomfort, but characterized her primary problems as "more social in origin."  Tr. 407.  So, as with the ALJ's other reasons for discounting Dr. Niegisch's opinion, his third reason is also supported by substantial evidence.

To summarize, while the step 2 threshold is low, see McDonald, 795 F.2d at 1124, and the record could arguably support a determination that Baron's scoliosis was a severe impairment, that does not entitle her to a reversal of the ALJ's decision, see Tsarelka, 842 F.2d at 535.  To the contrary, because the ALJ's determination that Baron's scoliosis was not a

severe impairment is supported by substantial evidence, in the
form of Dr. Loeser's opinion (and Dr. Trumbull's opinion), that
determination must be affirmed.  See id.

### 3. Mental Impairments

Baron claims that "[t]he ALJ erred in relying upon the
opinion of Dr. Martin and ignoring the limitations from the
examining psychologists, Dr. Read and Dr. Dinan, in light of the
increasing severity of Ms. Baron's mental condition."  Cl.'s
Mot. to Reverse (doc. no. 8) 8.

Claimant's argument on this point is somewhat muddled.  She
accuses the ALJ of omitting limitations posited by Dr. Dinan
from his assessment of her RFC but, as the court has already
pointed out, the ALJ never assessed Baron's RFC, because he
determined that none of her impairments were severe.  Be that as
it may, Baron's second claim boils down to one simple question,
i.e., whether substantial evidence supports the ALJ's finding
that Baron had only mild limitations in the area of
concentration, persistence or pace.

The Social Security regulations prescribe a specific
technique for evaluating mental impairments.  See 20 C.F.R. §§
404.1521a & 416.921a.  That paradigm identifies

> four broad functional areas in which [an ALJ] will
> rate the degree of [a claimant's] functional
> limitation: Activities of daily living; social

27

functioning, concentration, persistence, or pace; and
episodes of decompensation.

20 C.F.R. §§ 404.1521a(c)(3) & 416.921a(c)(3).  The regulations

go on to explain the way in which functional limitations in

those areas are rated:

> When [an ALJ] rate[s] the degree of limitation in the
> first three functional areas . . . [he] will use the
> following five-point scale: None, mild, moderate,
> marked, and extreme.  When [an ALJ] rate[s] the degree
> of limitation in the fourth functional area . . . [he]
> will use the following four-point scale: None, one or
> two, three, four or more.

20 C.F.R. §§ 404.1521a(c)(4) & 416.921a(c)(4).  Finally,

> [i]f [an ALJ] rate[s] the degree of [a claimant's]
> limitation in the first three functional areas as
> "none" or "mild" and "none" in the fourth area, [he]
> will generally conclude that [the claimant's]
> impairment(s) is not severe, unless the evidence
> otherwise indicates that there is more than a minimal
> limitation in [the claimant's] ability to do basic
> work activities.

20 C.F.R. §§ 404.1521a(d)(1) & 416.921a(d)(1).

Here, the ALJ rated Baron's degree of limitation in the

first three functional areas as "mild" and "none" in the fourth

area.  As a consequence, he determined that her mental

impairments were not severe.  For her part, claimant challenges

only the ALJ's finding that her limitation in the area of

concentration, persistence or pace was no more than mild.

The ALJ explained his finding on concentration, persistence

or pace this way:

> Upon completing a consultative psychological
> evaluation in July of 2012, Juliana Read, Ph.D. opines
> that the claimant is capable of understanding and
> remembering both simple and complex instructions and
> detailed procedures. The claimant is noted to attain
> a score of 28 out of 30 points on the Folstein Mini
> Mental Status Exam. Upon undergoing examination on
> December 1, 2014, while acknowledging her sobriety,
> the claimant's memory is noted to be intact and her
> concentration and attention "fair."

Tr. 22 (citations to the record omitted). In further support of his finding, the ALJ indicated that he gave substantial weight to the opinions of Drs. Read, Dinan, and Martin.

Claimant offers several criticisms of the ALJ's finding on concentration, persistence or pace, but none is persuasive. First, claimant accuses the ALJ of ignoring Dr. Dinan's opinions that her task initiation was erratic, that her persistence was poor, and that her pace was slow. However, the ALJ expressly addressed those opinions, stating that "while Dr. Dinan also notes some erratic task initiation and poor persistence, these findings are noted, as evidenced by his assigned overall GAF score of 65, to be consistent with my above-noted finding of only some mild limitation in functioning overall,"[12] Tr. 23.

---

[12] "The Global Assessment [of] Functioning [GAF] scale is used to report a clinician's judgment of an individual's overall level of psychological, social, and occupational functioning at the time of evaluation." Gillen v. Colvin, No. 16-cv-59-JL, 2017 WL 775785, at *8 n.5 (D.N.H. Feb. 28, 2017) (quoting Nickerson v. Colvin, No. 15-cv-487-SM, 2017 WL 65559, at *4 (D.N.H. Jan. 6, 2017)) (internal quotation marks and citations

Next, claimant accuses the ALJ of omitting any mention of Dr.
Read's opinion that "she is not consistently capable of holding
her concentration," Tr. 235, but the ALJ did specifically
mention that opinion, and, supportably, found it to be
inadequately supported by the record, see Tr. 23.  Claimant also
criticizes the ALJ for supporting his finding with her score on
the Folstein Mini Mental Status Exam, but even if scores on that
exam are not substantial evidence for the ALJ's finding, that is
not the only evidence on which the ALJ relied, so his citation
of that test score, if erroneous at all, would not be a
reversible error.

Claimant concludes by arguing that the ALJ erred by
ignoring the fact that her mental health had deteriorated over
time and relying on Dr. Read's July 2012 opinion and Dr.
Martin's December 2013 opinion, both of which were outdated by
the time the ALJ rendered his decision in April of 2015.  In
making that argument, claimant cites a record generated as a
result of a December, 2014, visit to Riverbend.  While claimant

---

omitted).  A GAF score of 61 to 70 indicates "[s]ome mild
symptoms (e.g., depressed mood and mild insomnia) OR some
difficulty in social, occupational, or school functioning (e.g.,
occasional truancy, or theft within the household), but
generally functioning pretty well, has some meaningful
interpersonal relationships."  Am. Psychiatric Ass'n, Diagnostic
and Statistical Manual of Mental Disorders [DSM-IV-TR] 34 (4th
ed. 2000).

says that the ALJ ignored her deteriorating mental health, he cited the December 2014 Riverbend record, and claimant points to nothing in that record that would undermine the ALJ's finding concerning concentration, persistence or pace. Thus, like claimant's other arguments, this one goes nowhere.

Claimant, who bears the burden of proving that she is disabled, see Yuckert, 482 U.S. at 146, has given the court no reason to reject the ALJ's finding that she was only mildly limited in her capacity for concentration, persistence or pace. Thus, that finding, and the ALJ's determination that claimant had a non-severe mental impairment, are supported by substantial evidence in the form of the opinions provided by Drs. Martin and Dinan. A contrary determination might also be supported, but that is not the test. See Tsarelka, 842 F.2d at 535. Because the ALJ's determination that Baron did not have a severe mental impairment is supported by substantial evidence, it must be affirmed.

## IV. Conclusion

The ALJ in this case committed neither a legal nor a factual error in evaluating Baron's claims. Accordingly, her motion for an order reversing the Acting Commissioner's decision, document no. 8, is denied, and the Acting Commissioner's motion for an order affirming her decision,

document no. 13, is granted.  See <u>Manso-Pizarro</u>, 76 F.3d at 16.
The clerk of the court shall enter judgment in accordance with
this order and close the case.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

August 21, 2017

cc:  Penelope E. Gronbeck, Esq.
     T. David Plourde, AUSA